**Nathan G. Wagner**
WAGNER & LYONS, PLLC
1821 South Avenue West, Suite 501
Missoula, Montana 59801
Telephone:  406-226-2552
Facsimile:  406-226-2553
E-Mail:      nate@swl.legal; mail@swl.legal

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| JUSTIN KRASKE, | Cause No. _____ |
| Plaintiff, | |
| v. | |
| MONTANA DEPARTMENT OF PUBLIC SERVICE REGULATION; MONTANA PUBLIC SERVICE COMMISSION; COMMISSIONERS ROBERT LAKE, BRAD JOHNSON, TONY O'DONNELL, RANDALL PINOCCI; ROGER KOOPMAN; JAMES BROWN, and JENNIFER FIELDER, individual and official capacities; MANDI HINMAN, individual and official capacity; DREW ZINECKER, individual and official capacity; and DOES I-X, individual and official capacities, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

The Plaintiff, Justin Kraske, alleges and complains as follows:

## JURISDICTION AND VENUE

1.      This is a civil rights action arising from Defendants' wrongful discharge of Plaintiff. This action is brought pursuant to 42 USC § 1983, the First, Fifth and Fourteenth Amendments to the United States Constitution, Mont. Code Ann. § 39-2-901 et seq, and Mont. Code Ann. § 2-2-145.

2.      The Court therefore has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and has jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

3.      Jurisdiction and venue are proper in this Court because the acts and omissions alleged herein occurred in Helena, Montana, which is part of the Helena Division of the District of Montana.

## PARTIES

4.      Plaintiff, Justin Kraske ("Mr. Kraske"), brings this action against the Defendants for wrongful discharge and violation of his civil rights under 42 USC § 1983 and the First, Fifth and Fourteenth Amendments to the United States Constitution and is a resident of Helena, Lewis and Clark County, Montana.

5.      Defendant Montana Department of Public Service Regulation and Public Service Commission ("PSC" or "Commission") is a political subdivision of the state of Montana based out of Helena, Lewis and Clark County, Montana.

6.      Defendant Brad Johnson ("Mr. Johnson" or "Commissioner Johnson") was, at all times relevant to this action, a Commissioner with the PSC.

7.      Defendant, Robert Lake ("Mr. Lake" or "Commissioner Lake") was a Commissioner with the PSC until January 4, 2021.

8.      Defendant, Roger Koopman ("Mr. Koopman" or "Commissioner Koopman") was a Commissioner with the PSC until January 4, 2021.

9.      Defendant, Tony O'Donnell ("Mr. O'Donnell" or "Commissioner O'Donnell") was, at all times relevant to this action, a Commissioner with the PSC.

10.     Defendant, Randall Pinocci ("Mr. Pinocci" or "Commissioner Pinocci") was, at all times relevant to this action, a Commissioner with the PSC.

11.     Defendant, Jim Brown ("Mr. Brown" or "Commissioner Brown") was a Commissioner-elect on November 4, 2020 with the PSC and was sworn in on January 4, 2021.

12.     Defendant, Jennifer Fielder ("Ms. Fielder" or "Commissioner Fielder") was a Commissioner-elect on November 4, 2020 with the PSC and was sworn in on January 4, 2021.

13.     Defendant, Mandi Hinman ("Ms. Hinman") was, at all times relevant to this action, the Centralized Services Division Administrator of the PSC.

14.     Defendant, Drew Zinecker ("Mr. Zinecker") was the Communications Director with the PSC from March 2019 until his termination on October 20, 2020.

15.     Does I-X are unknown parties who may be liable to Plaintiff for damages he has suffered as a result of the acts and omissions alleged in this Complaint.

## ALLEGATIONS COMMON TO ALL COUNTS

16.     Mr. Kraske graduated from the University of Montana in May of 2004 with a Bachelor's degree in Business Administration with a Finance emphasis.   He also graduated with minors in Economics and Political Science.   He attended the University of Montana School of Law and graduated with a Juris Doctorate in 2007. He took and passed the Montana Bar Exam in the summer of 2007 and was formally admitted to practice in both the state and federal courts in Montana on October 4, 2007.  He was hired as a staff attorney at the PSC in December of 2007.  He started work on January 22, 2008 with a six-month probationary period and a training assignment.  Mr. Kraske successfully completed his probationary period in 2008 and his training assignment in 2009 and was thereafter a classified staff attorney at the PSC.

17.     During his tenure with the PSC, Mr. Kraske attended Michigan State University's Institute of Public Utilities Annual Regulatory Studies Program in August of 2008 to learn utility regulation fundamentals.  Mr. Kraske was a member of the National Association of Regulatory Utility Commissioners Staff Subcommittee on Law from 2011 until 2020.  He was President of the National Conference of Regulatory Attorneys' Conference which was held in Missoula,

Montana in June of 2011. He attended numerous regulatory attorney continuing legal education courses during his tenure at the PSC.

18.     During his career with the PSC, he was admitted to practice in front of the 7th, 9th, 10th, and DC Circuit Court of Appeals and he joined with other states' attorney generals or regulatory attorneys on legal matters important to Montana in front of these Courts.

19.     In the Spring of 2013, the PSC's prior Chief Legal Counsel retired and Mr. Kraske was asked to be interim Chief Legal Counsel pending the selection of a Chief Legal Counsel by a competitive solicitation and application process. The Chief Legal Counsel position was posted on the State of Montana career website, applications were received, and structured interviews were completed. He was one of an unknown number of candidates for this position. This was the same hiring process that was utilized for all PSC employees regardless of classified or non-classified position status.

20.     Following a structured interview process with the five Commissioners, a closed work session was held in which the Commissioners scored the candidates and voted to hire Mr. Kraske as the Chief Legal Counsel. The only caveats the PSC placed on Mr. Kraske's hiring was that he begin the Chief Legal position after he passed a criminal background check. After successfully passing the criminal background check, he became the Chief Legal Counsel. While Mr. Kraske was

Chief Legal Counsel, he was never subject to an employee evaluation, only a self-evaluation that was placed in his personnel file.  He was never disciplined by the PSC or given written warnings about his work as Chief Legal Counsel or as a staff attorney.  Mr. Kraske was employed by the PSC for almost 13 years, seven and a half of which he held the position of Chief Legal Counsel.

21.     Mr. Kraske supervised, hired, and mentored attorneys and PSC staff during his work as Chief Legal Counsel.  During Mr. Kraske's tenure, the PSC's legal and consumer assistance staff consisted of four attorneys, one paralegal, and three consumer assistance personnel who were tasked with advising the PSC on its contested cases, Montana District Court and Supreme Court appeals, and roughly 1,000 consumer inquiries/complaints per year.  Several of the attorneys and legal staff he supervised went on to work at the Montana Attorney Generals' Office, Montana Consumer Counsel, and other prestigious legal positions throughout Montana and other states.

22.     As Chief Legal Counsel, Mr. Kraske worked with staff attorneys and outside counsel in 2018 to successfully defend the PSC against a declaratory action filed by Bear Gulch Solar, LLC.  The declaratory action was filed in the Montana Federal District Court by Quinn Emanuel, a highly successful, large international business law firm, and was appealed to the Ninth Circuit Court of Appeals.  The PSC

prevailed in front of the Ninth Circuit in June of 2019. *Bear Gulch Solar, LLC v. MPSC,* No. 18-36061 (9th Cir. 2019).

23.     As Chief Legal Counsel, Mr. Kraske was one of four members of the PSC's Agency Coordinating Team ("ACT").  The other three members consisted of the Regulatory Division Administrator, Will Rosquist, Centralized Services Division Administrator, Ms. Hinman, and Communications Director, Mr. Zinecker.

24.     Beginning in January 2019, Mr. Kraske and Mr. Rosquist received multiple complaints from PSC employees about actions taken by Ms. Hinman.  Based on one of the employee complaints, Mr. Kraske notified Chairman Johnson by phone on January 28, 2019 and also met with him in person early in the morning on the 29th to discuss a complaint Mr. Kraske had received regarding a post Ms. Hinman had posted online on her public Facebook page.  Ms. Hinman's Facebook page listed her as a division administrator at the PSC.  The complainant felt the post was directed at them as Ms. Hinman's subordinate.  During Mr. Kraske's investigation, it was determined the post was posted the day prior to the agency's budget hearing and stated that Ms. Hinman was "10 times the bitch you could ever hope to be. Now run along."  Then a friend of Ms. Hinman and PSC employee whom Ms. Hinman supervised said, "[n]ot that I wouldn't want to see you go full-blown bitch on the committee."  Ms. Hinman responds, "[w]ait for it."

25.     At the agency's budget hearing, Ms. Hinman was completely unprepared and was unable to answer questions. Due to Ms. Hinman's inadequacies, the budget hearing was cancelled and rescheduled for the following week. Mr. Kraske was concerned about whether Ms. Hinman could professionally handle the budget hearing for the PSC and how the PSC's reputation would be impacted by her actions at the committee meeting. Mr. Kraske discussed these concerns with Chairman Johnson and proposed that other PSC staff handle the budget hearing going forward.

26.     Ms. Hinman, as the Centralized Services Division Administrator, was the sole human resource officer, oversaw the agency's budget, the IT system, and managed several employees. Several of the complaints Mr. Kraske received concerned Ms. Hinman's ability to adequately manage the Centralized Services Division. After Mr. Kraske received these complaints, he attempted to discuss them with individual Commissioners as it appeared to Mr. Kraske that Ms. Hinman was unprofessionally managing the Centralized Services Division, negatively impacting the operations and reputation of the agency, and was potentially causing the PSC liability in its employment obligations.

27.     The complaints Mr. Kraske and Mr. Rosquist received ranged from allegations of a hostile and harassing work environment including retaliation toward multiple PSC employees, Ms. Hinman threatening to push employees out of their jobs by any means necessary, concerns about how Ms. Hinman was conducting

agency operations as the sole human resource manager, allegations that Ms. Hinman was sharing confidential employee information with employees who did not have a business need to know such information, misuse of state resources, violations of multiple state laws, unprofessional actions toward the PSC's budget committee, and alleged triangulation behavior toward employees and her subordinates at the PSC.

28.    Because Ms. Hinman was the sole human resource manager, human resource staff, EEO officer, ADA coordinator, and oversaw the other human resource employee and the employees' concerns involved Ms. Hinman directly, Mr. Kraske was precluded from discussing them directly with Ms. Hinman or any other human resource employee at the PSC.  Instead, he informed Chairman Johnson of the complaints that had been brought to him, and advised Chairman Johnson that he would be seeking direction from the ultimate human resource entity, the State of Montana's Department of Administration ("DOA").  Chairman Johnson did not like this idea and felt DOA and other Commissioners did not need to be involved.

29.    Mr. Kraske then reached out to the Risk Management and Tort Defense Division of DOA ("RMTD") in February of 2019 for guidance on how to address the various concerns that had been raised by the PSC's staff.  After an initial meeting with attorneys at RMTD to discuss these allegations, they recommended Mr. Kraske start an investigation to determine whether the staff allegations had merit, interview past and current employees to determine the extent and duration of the issues, that

he document his concerns in a memo to his client, the PSC as a whole and explain the options for the PSC moving forward.

30.    After the meeting Mr. Kraske informed Chairman Johnson that he had met with DOA about the issues with Ms. Hinman.  Chairman Johnson asked specifically for the name and contact information of the individuals Mr. Kraske contacted and he provided the contract information to Chairman Johnson at his insistence. Chairman Johnson appeared to be frustrated with Mr. Kraske's actions.

31.    Since Mr. Kraske is a licensed attorney with the State Bar of Montana, he had an obligation to inform his client, the PSC, once he became aware of unethical behavior, violations of the legal obligations of an organization, violations of law, or public policy concerns.  Montana Rules of Professional Conduct - Rule 1.13 states "if a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization.  Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the

highest authority that can act on behalf of the organization as determined by applicable law."

32.    Additionally, the PSC's internal operations manual ("Bluebook") sets out ethical standards for Commissioners and staff.   Ethical Standard VI requires "Commissioners or staff to disclose to his or her supervisor any job-related illegal or unethical behavior on the part of any individual, including the employee or Commissioner him/herself.   (And/or report to the Commissioners of Political Practices.)"   As such, Mr. Kraske contacted the State Bar of Montana to further understand his obligations to his client under the Montana Rules of Professional Conduct.  He was advised to contact DOA, which he had already done, and prepare a comprehensive memo and provide it to all the Commissioners consistent with Rule 1.13, not just the Chairman since the PSC as a whole was his client.

33.    Mr. Kraske followed the advice of the Montana State Bar and DOA and began documenting his concerns in a memo.   Mr. Kraske provided that memo to the Commissioners on October 21, 2019.  Mr. Kraske's memo summarized his concerns and the various complaints he received from PSC employees regarding Ms. Hinman.

34.    While Mr. Kraske's investigation was ongoing, the PSC hired Mr. Zinecker on March 13, 2019 as the PSC's Communications Director.  He was still working for the Montana State Senate when he was hired at the PSC.  He was hired by Commissioners through an unknown process that varied substantially from how

prior non-classified Administrators including Mr. Kraske, Mr. Rosquist, Ms. Hinman, and many others were hired at the PSC.  After Mr. Zinecker's hire, it became clear that not all Commissioners had an opportunity to be involved in the interview process or discuss the decision to hire Mr. Zinecker as Commissioner Koopman alleged he was cut out of the interview process and decision-making leading to Mr. Zinecker's hiring.  Additionally, no PSC work session was held to discuss and vote on whether to hire Mr. Zinecker which is problematic as quasi-judicial bodies who operate under quorums must hold public meetings and allow public participation.

35.    Several months after Mr. Zinecker began working as the PSC's Communications Director, in approximately May of 2019, Mr. Zinecker began exhibiting concerning behaviors prompting Mr. Kraske to also document his behaviors in order to inform his client, the PSC, of potential legal issues and liability as the direct result of Ms. Hinman and now Mr. Zinecker's actions.

36.    In May of 2019, after divulging his concerns involving Ms. Hinman to Chairman Johnson, and while his investigation into Ms. Hinman's behaviors was occurring, Mr. Kraske was contacted by Jim Kerins, from CMS Management Services; CMS is a consulting firm that was hired by the full PSC in 2016 at a publicly noticed work session to do an agency wide review and recommend productive agency operations; that work had been previously completed and CMS

had not worked with or for the PSC since that time. Mr. Kerins contacted Mr. Kraske to schedule a meeting to discuss "communication issues" regarding Ms. Hinman and himself. Mr. Kerins disclosed that he was hired by Chairman Johnson without the PSC's full approval or knowledge. This alarmed Mr. Kraske as the PSC is obligated to conduct its business in accordance with Montana's open meeting laws and the PSC for several decades has conducted weekly business meetings in which approval of such services as CMS is placed on a public agenda, discussed, and approved by all members of the PSC, not the Chairman at his sole discretion. This meeting request also came after Mr. Kraske learned information from his investigation may have been leaked to Ms. Hinman by Chairman Johnson. Mr. Kraske expressed to both Mr. Kerins and Chairman Johnson that he had concerns about the meeting and the associated employment of Mr. Kerins absent full PSC approval, as it appeared Chairman Johnson and Ms. Hinman approved this expenditure without PSC action or approval. Mr. Kraske also explained to Mr. Kerins that he had contacted DOA and there was an ongoing investigation involving Ms. Hinman. Mr. Kraske stated he did not feel this meeting was necessary as the issues Mr. Kraske was investigating were not communication issues but complaints he had received from several former and current Commission staff.

37. After expressing these concerns, Mr. Kraske was threatened by Chairman Johnson to either participate in the meeting or risk his position as Chief Legal

Counsel.  Mr. Kraske was concerned for his livelihood and therefore was forced to participate in the meeting with CMS and to sign an "Operational Agreement" between him and Ms. Hinman following his meeting with CMS.  Mr. Kraske did not want to sign this agreement and upon review of the "Operational Agreement" insisted on an opt-out provision stating that, "nothing in this operational agreement precludes either of the parties from bringing concerns or issues to the full Commission, as appropriate and consistent with the Commission Bluebook, agency rules, Montana Attorney Rules of Professional Conduct, or Montana law."  Given that Mr. Kraske's employment was being threatened by Chairman Johnson, Mr. Kraske felt he had no option but to sign the operational agreement.

38.    Shortly after Mr. Kraske was forced to sign the operational agreement with Ms. Hinman, he continued his investigation and began drafting a memo on his findings.

39.    Around this time, the Legislative Audit Division received a complaint through its anonymous intake system about Ms. Hinman's substantial salary increases over the preceding five years or so and contacted Chairman Johnson for a response and documentation from the agency.  Chairman Johnson requested that Mr. Kraske contact the Legislative Audit Division and determine who had made that report against Ms. Hinman.  Mr. Kraske explained that complainants are protected under law from retaliation and it is not appropriate to inquire into who filed a complaint

involving this matter or attempt to retaliate against any state employee, if it was a state employee.  The audit intake and confidentiality is for a legitimate purpose for reporting fraud, waste, and abuse of state resources.  =

40.    On July 23, 2019, Mr. Kraske emailed Chairman Johnson and Vice-Chairman Lake about concerns Mr. Kraske's consumer assistance staff had regarding the rollout of the PSC's new case management software system, ("EDDI"). EDDI was developed by the state's information technology service division ("ITSD") with oversight and guidance by Ms. Hinman.  Ms. Hinman was the sole contact and person responsible for the development of EDDI at the PSC as IT fell under her direct supervision and she was the signatory for the contract.  Mr. Kraske explained to Chairman Johnson and Vice-Chairman Lake that his staff may be unable to do their jobs going forward in an efficient manner as the consumer assistance intake system was being shut down, that there was no true replacement contemplated within the EDDI system, and little training or testing had been done on how to use the EDDI system for consumer complaint intake.  Chairman Johnson and Vice-Chairman Lake did nothing to address Mr. Kraske's concerns.

41.    On October 4, 2019, Ms. Hinman and Mr. Zinecker contacted the Helena Police Department ("HPD") to report alleged theft or abuse of resources by a Commission employee identified in the Order on Declaratory Ruling issued by the Montana First Judicial District Court in Cause No. ADV-2020-738 as John Doe 3.

Ms. Hinman and Mr. Zinecker contacted the HPD without consulting Mr. Kraske, the PSC legal department, or the PSC as a whole.  Mr. Kraske did not find out about this incident until weeks later.  Upon learning of this incident, Mr. Kraske assigned an attorney from the legal staff to work with Ms. Hinman to conduct an investigation into the allegations.

42.    The investigation did not find any basis for claims of theft or abuse of resources by John Doe 3, as alleged by Ms. Hinman and Mr. Zinecker.  Mr. Kraske requested a copy of the information report from the City of Helena Attorney's office. Upon receiving the report from the City of Helena, Mr. Kraske learned that following an investigation, HPD determined that there was insufficient evidence to pursue charges against John Doe 3.

43.    On October 10, 2019, Ms. Hinman and Mr. Zinecker reached out to Abra Belke, an attorney from Washington state that was not licensed to practice in Montana at that time, who was a friend of Mr. Zinecker through his work at the Montana State Senate.  Mr. Zinecker set up a conference call on October 18, 2019 with himself, Ms. Hinman, Chairman Johnson, Vice-Chairman Lake, Abra Belke, and Kyle Raprager (Ms. Belke's then fiancé now husband) to discuss providing a legal memo involving the PSC's contract with the State's ITSD involving the development of the EDDI case management system.  Two days prior to this meeting, Mr. Zinecker emailed Ms. Hinman and the heading was "Conversation with attorney

Abra Belke."  In the email, Mr. Zinecker stated, "[i]f you want that milquetoast lawyer gone, this is a good reason. This should never have been allowed to happen." It appears that this statement is referring to Mr. Kraske as Chief Legal Counsel.  A follow-up email from Ms. Hinman asks Mr. Zinecker if he sent this email to the Chairman and Vice-Chairman.  It is clear from these communications that Chairman Johnson, Vice-Chairman Lake, Ms. Hinman and Mr. Zinecker had been trying for some time to remove Mr. Kraske from his Chief Legal Counsel position.

44.     On October 17, 2019, at their request, Mr. Kraske met with Ms. Hinman and Mr. Zinecker to discuss the allegations of theft or abuse and job performance of John Doe 3.  During the meeting, Mr. Zinecker's demeanor led Mr. Kraske to suspect that the motivations for pursuing disciplinary action against John Doe 3 were improper. During this meeting, Ms. Hinman and Mr. Zinecker said several very concerning and vulgar things about PSC employee John Doe 3.  These statements shocked Mr. Kraske and made him so uncomfortable he decided to document these comments right after the meeting on his work computer.  For instance, as outlined in Mr. Kraske Staff Memo #3 released by the Montana First Judicial District Court, Mr. Zinecker made comments like, "hopefully with all the entities involved with his [John Doe 3] investigation when he [John Doe 3] sees that in the letter I [Mr. Zinecker] hope John Doe 3 shits himself. Up and down both legs." Ms. Hinman responds, "gross hopefully not when he [John Doe 3] is back at work." Mr. Zinecker replies, "no at

home wearing a diaper." This conversation made Mr. Kraske extremely uncomfortable, especially after Mr. Kraske learned that Ms. Hinman inappropriately involved Mr. Zinecker in the investigation into John Doe 3 and subsequent unrelated HR processes. Mr. Zinecker as the Communications Director at the PSC, had no business reason to be involved in any PSC employment action and/or investigation.

45.    After several months passed, and many nefarious events came to light about Mr. Zinecker's behavior as the Commission's Communications Director, including that Mr. Zinecker had unfettered access to all of the Commissioner's emails, Mr. Kraske began to suspect that Ms. Hinman and Mr. Zinecker's motivations to discipline John Doe 3 were in part, to intimidate John Doe 3 as he was aware that Mr. Zinecker had been given access to the PSC's emails by Ms. Hinman. Ms. Hinman had authorized Mr. Zinecker's access to Commissioner emails without their knowledge or approval and Ms. Hinman ordered John Doe 3 to provide that access to Mr. Zinecker. During Mr. Kraske's investigation into Ms. Hinman he found that Ms. Hinman and Mr. Zinecker were targeting employees, including John Doe 3 that were aware of these concerning and unethical actions and were either intimidating, threatening, retaliating, or harassing those employees to either force them out of their jobs or to keep them quiet.

46.    Mr. Kraske perceived these behaviors as inappropriate, not directly connected to any employees' job performance or employment responsibilities, targeting

employees for political reasons, and as having the potential to create liability for the PSC's employment obligations.

47.    Due to Mr. Kraske's escalating concerns about Ms. Hinman and Mr. Zinecker's behaviors toward PSC employees and the extremely disturbing meeting with them on October 17, 2019, Mr. Kraske completed his first investigative memo which dealt primarily with Ms. Hinman's behavior and prepared it for circulation to the full PSC. Mr. Kraske intended to discuss this memo with Commissioners at one of its weekly business meetings.  On October 21, 2019, Mr. Kraske delivered his first investigative memo to the Commissioners and provided a copy to RTMD.

48.    Mr. Kraske's memo detailed a variety of issues with Ms. Hinman's behavior which led to IT and technology disruptions, caused a variety of human resource issues, impacted the Commission's budget and accounting, resulted in the Commission having a negative audit in 2019, and created substantial legal risks to the Agency.  Mr. Kraske outlined specific events and examples that supported his concerns and his investigative findings.

49.    Mr. Kraske's memo also described Ms. Hinman's decision to authorize Mr. Zinecker to access Commissioner and employee emails without their knowledge or permission.   Mr. Kraske was apprised of Ms. Hinman's actions through his investigation, based on employee complaints.  This breach was later confirmed after Mr. Zinecker leaked Commissioner Roger Koopman's emails to NorthWest Liberty

News after having shopped them to several media outlets. Mr. Kraske advised Commissioners that staff reported that they had been threatened with disciplinary action including termination if they expressed their concerns to Commissioners and/or other managerial staff other than Ms. Hinman. Staff expressed that they were retaliated against and feared for their livelihoods. Mr. Kraske was concerned that these behaviors violated multiple employment laws including laws regarding retaliation.

50.   Mr. Kraske talked to Commissioners after distributing his investigative memo about the urgency of dealing with these issues, however the majority of the Commissioners, with the exception of Commissioner Koopman, opted to delay addressing these significant issues which were directly impacting and implicating the agency.   Multiple Commissioners including Vice-Chairman Lake, Commissioner O'Donnell, and Commissioner Pinocci told Mr. Kraske that Chairman Johnson and Ms. Hinman have "personal issues" that impacted and prevented them from dealing with the issues documented in Mr. Kraske's memo. Mr. Kraske was unsure what "personal issues" meant and whether the Commissioners were being truthful.

51.   After giving the Commissioners some time to analyze his concerns, Mr. Kraske scheduled a work session in December 2019 to discuss his memo.

Commissioner Koopman also scheduled a work session to discuss employee personnel issues that he felt the PSC should address.

52.     The work sessions were scheduled for December 17, 2019.  Prior to the scheduled meeting both Chairman Johnson and Vice-Chairman Lake attempted to cancel these work sessions over the objection of the requestors, Mr. Kraske and Commissioner Koopman.  Chairman Johnson and Vice-Chairman Lake claimed that due to the holidays they did not want to deal with these issues and that they had obtained a majority of PSC votes.  Mr. Kraske is not aware of any open meeting in which these concerns were discussed or voted on and this appears to be a violation of Montana's open meeting laws.  Due to these public notice issues and other legal concerns, Commissioner Koopman demanded via email that both work sessions move forward as scheduled.

53.     Ultimately, the work sessions were held and closed to the public, as the PSC felt Ms. Hinman and Mr. Zinecker had a right to privacy despite conducting a balancing test as required under Montana Law.  During the closed work session, Mr. Kraske presented the contents of his Staff Memo No. 1 to the PSC which a redacted version was subsequently released to the public by the Montana First Judicial District Court in September of 2020.

54.     Mr. Kraske explained that Ms. Hinman's behavior has led to IT and technology issues, caused a variety of human resource issues with multiple PSC

staff, has impacted the PSC's budget and accounting, and has created substantial legal risks to the Agency.

55.     Mr. Kraske explained that several PSC staff had alleged that Ms. Hinman had disclosed confidential employee personnel information to both employees and non-employees, created hostile situations at work, that she had pitted employees against each other, that she had targeted employees to push them out of their employment, that she had disrupted agency operations with her behaviors, failed to properly oversee the development of the PSC's EDDI case management system, and had negatively impacted the PSC's reputation in front of the Legislature.

56.     Mr. Kraske explained as the sole human resource officer at the PSC, it was unprofessional for someone in Ms. Hinman's position to disclose confidential personnel information, threaten to push people out of their employment and to cause various human resource and agency issues.

57.     Mr. Kraske also explained that in May of 2019 the Legislative Audit Division issued its biennial financial compliance audit on the PSC for the two fiscal years ending June 30, 2018.  The audit report at that time was the worst audit report that Mr. Kraske had seen since working at the PSC.  The PSC's 2020 audit report has since proven to be the worst audit report the State of Montana has seen in several decades.  That report, which was available on May 27, 2021 verified many of Mr. Kraske's concerns regarding Ms. Hinman and ultimately led to her resignation.

58.    When Mr. Kraske first started working at the PSC, no audit issues were identified in those reports, however beginning with the 2018 audit report the PSC began to face scrutiny.  The 2018 audit report contained six recommendations to the PSC related to accounting errors, compliance with state laws and policies, and internal controls.  The summary letter by Angus Maciver states that "[w]e qualified our opinion on the Schedule of Changes in Fund Equity for fiscal year 2017, because the Prior Year Expenditures & Transfers-Out and the Budgeted Expenditures & Transfers-Out were misleading in the State Special and Federal Special Revenue Funds.  Our opinion on the Schedule of Total Revenues & Transfers-In in fiscal year 2018 was adverse because the accounting errors were material and pervasive on the schedule in fiscal year 2018.  An adverse opinion means you cannot rely on the information presented on the Schedule of Total Revenues & Transfers-In for fiscal year 2018."  On page five of the report, the auditors indicate that they identified multiple deficiencies in internal controls, that management should consider whether other department resources could be reallocated to strengthen internal controls, that centralized services division staff erroneously overstated revenues and transfers-in by $4.5 million, that the errors considered in total made the disclosures materially misleading to a reader, and that the control deficiency was a material weakness.  The results of this audit report highlighted fundamental issues with the PSC's accounting

practices under the guidance of Ms. Hinman and again validated many of Mr. Kraske's concerns as expressed in his multiple memos.

59.     Due to the 2018 audit findings, Mr. Kraske explained to the PSC through his memo that he was concerned that if the PSC could not appropriately manage its own accounting records through its CSD Administrator, that parties or the public may question whether the PSC could appropriately audit utilities' records and set just and reasonable rates.

60.     The PSC declined to take any action and continued to employ Ms. Hinman despite their knowledge of her extremely concerning activities, substantial audit issues, and troublesome behavior.

61.     Despite his initial investigation, and after Mr. Kraske circulated and discussed his first memo with Commissioners, Mr. Kraske continued receiving complaints from PSC staff regarding Ms. Hinman and Mr. Zinecker.  Mr. Kraske was thus forced under his ethical and attorney obligations to expand and continue his investigation and documentation into these complaints.

62.     During his continued investigation Mr. Kraske found that on January 9, 2020, Mr. Zinecker contacted Commissioner Pinocci stating that Commissioner Koopman had exhibited threatening behavior toward him, that Mr. Zinecker was concerned for his personal safety and that Mr. Zinecker believed Commissioner Koopman might bring a firearm to the office for the purpose of harming Mr. Zinecker, other

Commissioners, or other employees. Mr. Zinecker further stated he was concerned about Commissioner Koopman.

63.    Shortly thereafter, on or about January 15, 2020, Mr. Kraske received a phone call from Chairman Johnson.  Chairman Johnson stated to Mr. Kraske that he had been contacted by John Hines, Vice-President of Supply/Montana Government Affairs at NorthWestern Energy regarding emails and an article on the Northwest Liberty News website.  Mr. Johnson stated the emails and article pertained to Commissioner Koopman and that the emails were from Commissioner Koopman's state email account.  Mr. Kraske immediately called Commissioner Koopman to notify him about the emails and article.

64.    After a review of the emails published on the website, it was determined that the emails were not released pursuant to a formal PSC records request and therefore had not undergone a privacy review as required under Montana law and the PSC's Bluebook.  The Bluebook explicitly contained an email request policy which required all records requests to be forwarded to the Chief Legal Counsel and managed by the legal staff.  This policy was enacted and adopted by previous Commissioners to address legal and privacy issues that could arise during such requests.  As a staff attorney years ago, Mr. Kraske was one of three members of the legal staff who researched, wrote, and presented the initial records request policy to the PSC, which was adopted and in place at the time of this incident. Further,

Commissioner Koopman had no advanced knowledge of the release, and had not been involved with any review of the released materials.

65.     Two days later after learning of the email breach, Mr. Kraske reported the data breach to the State's ITSD.  It was upon reporting the breach to State ITSD that Mr. Kraske learned that Ms. Hinman and John Doe 3 had administrator access to the email accounts of all five Commissioners and that additional access could be designated within the Commission under an administrator function.  At the time of the call, no one from State ITSD disclosed to Mr. Kraske that requests for Commissioner Koopman emails had been sent previously to them under the signature stamp of Chairman Johnson.

66.     Upon further investigation it was confirmed that Mr. Zinecker had been granted full access to the email accounts of all five Commissioners at the direction of Ms. Hinman and the use of Chairman Johnson's signature stamp.  This was done without the knowledge of one or more of the Commissioners.  At the advice of State ITSD, Mr. Kraske again contacted RMTD about the issue and at the request of RMTD completed a claim form.

67.     During this time frame, staff at the PSC began reporting concerns that law enforcement officials were walking through the building at various times.  This had never occurred previously and staff had not been notified by the PSC or Ms. Hinman that this would occur. Due to these concerns, legal staff approached Ms. Hinman

about the law enforcement walk-throughs.  Ms. Hinman responded by penning an email to the entire PSC staff stating that the Montana Highway Patrol ("MHP") had taken over security for state agencies and would be doing random walk-throughs at the Commission.  During the course of Mr. Kraske's investigation, this statement was proven to be false as MHP had not taken over security for state agencies and Mr. Kraske's investigation revealed that MHP had been contacted by Mr. Zinecker and Ms. Hinman

68.    On January 23, 2020, Ms. Hinman and Mr. Zinecker contacted MHP to discuss Mr. Zinecker's allegations of threatening behavior by Commissioner Koopman toward Mr. Zinecker, other employees, and commissioners.  MHP offered potential resources for resolution to Mr. Zinecker, but concluded that the matter appeared to be an internal human resources issue and did not require additional investigation or other action by MHP.

69.    That same day, Ms. Hinman and Mr. Zinecker met with an officer from HPD to discuss the same allegations raised to MHP.  Like the MHP, HPD did not take any action.

70.    Shortly thereafter, on February 5, 2020, Phil Drake, on behalf of the Great Falls Tribune, made a request to Mr. Kraske for "any and all correspondence, emails, etc., among commissioners and staff regarding issues of security at the PSC."

71.     In compliance with the PSC's policy on email requests, Mr. Kraske placed a legal hold on the requested records and assigned legal staff to manage the request.

72.     On February 7, 2020, DOA notified Mr. Kraske that during the course of its investigation, it discovered that, in November and December 2019, written requests bearing the signature stamp of Chairman Johnson had been made to DOA for access to Commissioner Koopman's email account.  Mike Manion, the head of the DOA notified Mr. Kraske that the documents were being turned over to the Billings Gazette based upon a request they had made for documents from DOA.  Mr. Kraske saw those email requests to DOA for the first time when they were published in the Billings Gazette on February 21, 2020.

73.     On February 13, 2020, Mr. Kraske received a phone call and email from Tom Lutey, on behalf of the Billings Gazette, requesting information related to the release of Commissioner Koopman's emails to NorthWest Liberty News. The Gazette request sought the identities of "commissioners and staff with access to the email accounts, other than their own accounts, assigned to the staff and commissioners" and the identities of "commissioners and staff with access to the computer passwords o[f] other commissioners and staff," "requests made by anyone for the emails of Public Service Commissioners and Public Service Commission staff," "all emails created by staff or commissioners, concerning Roger Koopman's emails," and "all 2019 emails incoming or outgoing from the . . . email accounts" of a specified

commissioner and employee of the Commission.  In compliance with the PSC's policy on email requests, Mr. Kraske placed a legal hold on the requested records and assigned legal staff to manage the request. On February 18, 2020, Mr. Kraske delivered a second memorandum to the Commissioners regarding Mr. Zinecker and Ms. Hinman's concerning behaviors ("Staff Memo No. 2").  Staff Memo No. 2 presented Mr. Kraske's analysis of a series of events, including Mr. Zinecker gaining access to commissioners' emails, the unauthorized release of a portion of those emails to the media, and ongoing hostile working relationships that had developed among Mr. Zinecker, Commissioner Koopman, and other employees. Staff Memo No. 2 identified, by name or position, Ms. Hinman, Mr. Zinecker, and John Doe 3. Staff Memo No. 2 also provided legal analysis and advice pertaining to the appropriate response to the unauthorized release of Commissioner Koopman's emails, unauthorized access of employees to commissioner email accounts, and Mr. Zinecker's conduct as an employee.

74.    Staff Memo No. 2 was presented to the PSC at a closed work session during a regularly scheduled business meeting on February 18, 2020.  The work session was closed to the public to protect the privacy interests of the individuals identified in Staff Memo No. 2

75.    During the work session on February 18, the PSC voted to remove Mr. Zinecker from all the Commissioner's email accounts, as explained above there was

never a work session or PSC discussion to add him to all the Commissioner accounts. The PSC did not take any other action and allowed Ms. Hinman and Mr. Zinecker to remain employed with the PSC.

76.     Despite the fact that the PSC had held a public noticed work session the day before and that that was the appropriate venue to air their concerns, Ms. Hinman and Mr. Zinecker met a second time with MHP on February 19, 2020, to discuss Mr. Zinecker's concerns regarding Commissioner Koopman and Mr. Zinecker's personal safety.    During that meeting, Mr. Zinecker requested additional walkthroughs by MHP at the PSC offices and allegedly told MHP personnel that Mr. Zinecker had retained an attorney and was considering a lawsuit against Commissioner Koopman individually.    MHP indicated additional walkthroughs were possible, but directed that the request should be made through the DOA General Services Division ("GSD").

77.     Later that day, Mr. Zinecker sent an email to GSD to request MHP walkthroughs of the PSC offices and enhanced security on five separately identified dates.    Mr. Zinecker sent a follow-up email on that same date requesting confirmation that GSD could commit the additional requested resources. GSD indicated that the request sought resources in excess of what GSD could reasonably commit without a separate negotiated agreement for services. GSD suggested that Mr. Zinecker contact HPD or MHP directly if there was a documented credible

threat. All of Mr. Zinecker's and Ms. Hinman's requests were made without full PSC approval or knowledge.

78. On February 27, 2020, in order to comply with the records requests received by the media, two members of the legal staff met with the MHP to discuss Mr. Zinecker's and Ms. Hinman's prior discussions with their office and then Mr. Kraske became aware of the following dates and details outlined above.

79. In response to the initial Gazette request, Mr. Kraske provided a redacted version of Staff Memo No. 2 to the media on February 28, 2020. The redactions were made to protect individual privacy interests, attorney-client privilege, and attorney work product privilege. On March 9, 2020, Mr. Lutey and Martha Sheehy, counsel for the Billings Gazette, objected to the redactions and requested an unredacted version of Staff Memo No. 2 or, in the alternative, a basis for the redactions. Ms. Sheehy also requested "information regarding Roger Koopman's emails being given to the NorthWest Liberty News, and any resulting investigation by the PSC."

80. On March 3, 2020, Mr. Kraske delivered a third memorandum to the Commissioners ("Staff Memo No. 3") at a closed work session during the PSC's regularly scheduled business meeting.

81. Due to the growing concerns of staff and the PSC's legal team, the memo was written by the PSC's entire legal staff not just Mr. Kraske. The purpose of Staff

Memo No. 3 was to discuss employment matters regarding Mr. Zinecker and address ongoing issues with both Mr. Zinecker and Ms. Hinman.   Staff Memo No. 3 discussed possible employee disciplinary measures to be taken for threatening, harassing, intimidating, and generally inappropriate behavior toward other PSC staff and Commissioners.   Staff Memo No. 3 identified, by name or position, Mr. Zinecker, Ms. Hinman, and John Doe 3.

82.   On March 3, 2020, Mr. Kraske received an email from Kayla Desroches, on behalf of Yellowstone Public Radio, requesting "the memo [Kraske] released Feb. 18 to PSC commissioners," "the memo [Kraske] sent to the commissioners on March 02," a specified employee's "Feb. 14 email to the Commissioner 'making light of the email breach' and that 'appeared to state that Commissioner Koopman had it coming and deserved it,'" "[r]equests from commissioner or staff for email access to other commissioners' emails, including the records requests that Commissioner Pinocci filed on Nov. 20 and Dec. 09 where he asked to see Koopman's emails," "[a]ny and all emails or other written evidence to or from commissioners or staff that give insight into who is responsible for releasing Commissioner Roger Koopman's emails to Northwest Liberty News," and "[a]ny documentation that implicates the people/person who gave emails to Northwest Liberty News and otherwise was responsible for data breaches." In compliance with the PSC's policy

on email requests, Mr. Kraske placed a legal hold on the requested records and assigned legal staff to manage the request.

83.    On March 3, 2020 during a closed work session the PSC voted to suspend Mr. Zinecker with pay and hired the Attorney General's Office-Agency Legal Services ("ALS") to help determine how to proceed involving Mr. Zinecker's employment with the PSC and assist in drafting a letter to Mr. Zinecker.  Mr. Kraske and Luke Casey, a PSC staff attorney, met with ALS attorneys to discuss Mr. Zinecker's employment issues and also the outstanding records requests.  The PSC subsequently voted to hire ALS to also draft a Declaratory Ruling to file with the First Judicial District Court in Lewis and Clark County. The PSC sought the Court's assistance in determining the appropriate balance of the public's right to know versus the employee's right to privacy in relation to the records requested by the media entities. Mr. Kraske filed the Petition for Declaratory Ruling on April 30, 2020 consistent with PSC direction.

84.    On April 6, 2020, Mr. Kraske, based on PSC direction, sent a Pre-Termination Letter on behalf of the PSC to Mr. Zinecker outlining concerns with his behavior at the PSC.  Mr. Zinecker was given an opportunity to respond to the allegations in the April 6th letter.  Mr. Zinecker was given until April 14, 2020 to either provide a written response to the letter or appear at the work session scheduled to respond to the PSC possibly taking formal discipline against him.

85.    Mr. Zinecker responded to the allegations in his suspension letter and the PSC voted to hire outside counsel, Amy Christensen, to investigate the allegations contained in the PSC's suspension letter involving Mr. Zinecker.  After months of interviews and investigation, delayed primarily by Mr. Zinecker, Ms. Christensen issued her report on August 31, 2020. Ms. Christensen's report confirmed the majority of allegations in Mr. Kraske's memos and the PSC's April 2020 Pre-Termination letter suspending Mr. Zinecker with pay.  Ms. Christensen's report contained 17 attachments in support of her investigation.  Mr. Zinecker remained on paid leave until October 2020 while the independent investigation was ongoing and he was given numerous opportunities to explain his actions to the investigator and likely Commissioners.

86.    Prior to filing the Declaratory Ruling, Mr. Kraske contacted Mr. Zinecker, Ms. Hinman, and John Doe 3, and each asserted his or her right to privacy in the records that had been requested by the Billings Gazette, the Great Falls Tribune, and Yellowstone Public Radio.

87.    Mr. Kraske informed the court of these assertions via the Declaratory Ruling that was filed on April 30, 2020.  Ms. Hinman, Mr. Zinecker, and John Doe 3 were served with the Declaratory Ruling and allowed to participate in the action.  Ms. Hinman was the only Defendant to obtain counsel and file a brief on these issues. Ms. Hinman's attorney fees related to this issue were later paid for by the PSC despite

the Court determining that she had no right to privacy and the PSC being well aware of Ms. Hinman's ongoing misconduct.

88.     Ultimately, on September 14, 2020, the Montana First Judicial District Court ruled on the PSC's Petition for Declaratory Ruling and found that Ms. Hinman and Mr. Zinecker had no right to privacy based partially on their actions and also because of their positions within the PSC.  After the District Court's ruling, on September 15, 2020, Mr. Kraske notified the PSC that the District Court had ruled on the Complaint and that the emails and memos would be released to the media entities. Mr. Kraske applied the Court ordered redactions and turned over the requested emails and memos to the media entities.  The redacted versions were also filed in District Court in hard copy and DVD form and the case was closed in November 2020.

89.     On September 28, 2020, multiple staff members complained to Mr. Kraske that NorthWest Liberty News had emailed PSC staff on Saturday, September 26, 2020 an article titled "The liberal Deep-State at Montana's PSC is Fighting Against the Conservative Commissioners." The article defended Mr. Zinecker and Ms. Hinman and stated that staff at the PSC was fighting the conservative Commissioners.  Staff appeared upset and worried about this email from NorthWest Liberty News due to the preceding year of issues caused by Mr. Zinecker and Ms. Hinman.

90.     On October 20, 2020, more than seven and a half months after having been placed on paid administrative leave, Mr. Zinecker was terminated from the PSC by a 3 to 2 vote with Commissioners Johnson and Pinocci dissenting.  Mr. Zinecker collected over seven and a half months of salary, benefits, retirement, and accrued sick and vacation time while on administrative leave pending an independent investigation into his conduct and multiple opportunities over the seven and a half months to respond to the allegations.

91.     The PSC followed internal policy and state laws to terminate Mr. Zinecker.

92.     Additionally, Ms. Hinman received substantial salary increases, a major boost to her government pension, and continued employment during her time of misconduct.

93.     The PSC, however, did not follow internal policy and state laws when they decided to terminate Mr. Kraske in December of 2020.

94.     They did not provide Mr. Kraske any notice of the work sessions, opportunity to attend or respond, no due process, no reasons, no investigation, and no paid or unpaid administrative leave.

95.     On October 13 and 27, 2020, Commissioner Koopman held work sessions to discuss his questions surrounding the declaratory ruling, the unauthorized release of Commissioner emails, possible destruction of PSC documents pertaining to the case management system, law enforcement walk-throughs, and Mr. Zinecker and Ms.

Hinman's behaviors.  He requested an update from Mr. Kraske about the legal process surrounding the declaratory ruling and released records.  He also attempted to question Ms. Hinman regarding her actions, but was met with incomplete and evasive answers.

96.    Commissioner Koopman indicated in his work session document that he was attempting to secure answers to some of the more important questions raised by the release of documents, that potentially impacted both the operation and reputation of the PSC.

97.    On November 6, 2020 an administrative assistant who was supervised by Ms. Hinman, quit her position and provided an exit letter to the Commissioners and ACT team. The exit letter described how Ms. Hinman and Mr. Zinecker were working with Chairman Johnson and Vice-Chairman Lake to "setup" Mr. Kraske and blame him for the failure of the EDDI software development process that Ms. Hinman oversaw.  Not surprisingly, some of the emails that were released during the declaratory action document that Ms. Hinman, Mr. Zinecker, Chairman Johnson, and Vice-Chairman Lake hired an unlicensed attorney to write a legal memo in an attempt to blame Ms. Hinman's IT management failures on Mr. Kraske and targeting Mr. Kraske's employment in October of 2019.

98.    Approximately one week after the exit letter, on Saturday morning, November 14th, Chairman Lake emailed Mr. Kraske and asked him to meet with him and Vice-

Chairman Johnson on Monday November 16th at 3:30 pm at the PSC's offices. While receiving this email outside of business hours, Mr. Kraske responded to Chairman Lake and let him know he would meet as requested on Monday.

99.    When Mr. Kraske arrived at the PSC offices he was asked to join both the Chairman and Vice-Chairman in the Chairman's office.  As soon as Mr. Kraske was in the room and seated, Chairman Lake asked if he would resign his position as Chief Legal Counsel.  Chairman Lake indicated that four Commissioners were in support of Mr. Kraske resigning although again, neither the Chair nor Vice-Chair had scheduled or held a publicly noticed meeting to discuss Mr. Kraske's employment as required by the PSC's Bluebook or in accordance with Montana's open meeting laws.  Further, Mr. Kraske had been provided no documentation of such a meeting request or what constituted the basis for the PSC requesting his resignation.

100.   During the meeting, Chairman Lake insinuated that should Mr. Kraske not resign, his legal reputation would be at stake and his future legal prospects limited. Mr. Kraske was and continues to be unclear about what the Chairman's statements mean.  Mr. Kraske stated to both the Chairman and Vice-Chairman that he desired an opportunity to obtain legal counsel and would need some time to do so.  Chairman Lake requested Mr. Kraske tender his resignation to him by 5:00 p.m., four days later, on Friday, November 20, 2020.

101.   Mr. Kraske provided a letter to all the Commissioners by the November 20, 2020 deadline indicating that he would not be resigning his position as Chief Legal Counsel.  Commissioner Koopman was upset that the Chairman and Vice-Chairman did not notify him or include him in the resignation request or the other discussions behind the scenes that should have occurred as noticed meetings.

102.   In December of 2020, after new Commissioners were elected, the PSC held a new Commissioner Orientation for incoming Commissioners James Brown and Jennifer Fielder.  Chairman Johnson and Vice-Chairman Lake put Ms. Hinman in charge of the Orientation and initially excluded the other two Administrators, Will Rosquist and Justin Kraske.  This was very concerning after their extensive knowledge of Ms. Hinman's many issues as the Centralized Services Administrator and what Mr. Kraske documented in his three memorandums to the PSC.   This was the first time in Mr. Kraske's seven and a half years as the Chief Legal Counsel that he had been excluded from a new Commissioner orientation.  In fact, Mr. Kraske is not aware of any administrator ever being excluded from the new Commissioner orientation.

103.   Shortly after the New Commissioner Orientation, Mr. Brown requested a meeting with Mr. Kraske.  During the meeting on December 4, 2020, Mr. Brown requested copies of the memos that were released to the media.  Mr. Kraske provided

him copies and answered any questions that he had.  The memos were also sent to Commissioner Fielder.

104.   The PSC, excluding the newly elected Commissioners, held several closed work sessions during the holidays weeks of November 25, 2020 and December 30, 2020 to discuss Mr. Kraske's employment.  Mr. Kraske was not informed of these meeting and was not allowed to participate in the meetings.  The PSC issued several Notices of Commission actions on November 25, 2020 and December 30, 2020 and Commissioner Koopman issued dissents to both of those Notice of Commission Actions.

105.   On December 31, 2020 at 10:00 a.m., Vice-Chairman Lake emailed the entire PSC staff to notify them that Mr. Kraske was terminated by a 4-1 vote of the PSC at the close of business on the 31st which was inconsistent with a prior termination.

106.   Mr. Kraske was given no reason for his termination, was given no opportunity to respond, and was terminated immediately.

107.   The process in which the PSC terminated Mr. Kraske's employment was distinct and different from how the PSC handled Mr. Zinecker and Ms. Hinman's employment despite them holding similar management positions at the PSC, does not comply with Montana or Federal law, and is in direct violation of the PSC's own policies as outlined in the Bluebook, and is discriminatory and was done in

retaliation for reporting substantial misconduct by Commissioners and several of its employees.

108.   On February 25, 2021, Lesli Lahti, an auditor from the Legislative Audit Division reached out to Mr. Kraske through LinkedIn.   Mr. Kraske set up an appointment to talk to the auditor over the phone shortly thereafter.   After answering all of her questions, Mr. Kraske offered to turn over the public version of the staff memos and emails that were the subject of the declaratory ruling case.   Mr. Kraske did so.

109.   The PSC held a work session in the Spring of 2021 to discuss a request to pay Ms. Hinman's legal fees for contesting the disclosure of information about her actions at the PSC in the Montana First Judicial District Court Petition for Declaratory Action.   The PSC voted to pay those attorney fees on behalf of Ms. Hinman despite the Court ruling she had no right to privacy and with the extensive knowledge, through Mr. Kraske's memorandums, that Ms. Hinman had been not following state accounting provisions, policies, laws, and engaging in retaliation, falsification of documents, and harassment.

110.   On May 27, 2021, the PSC audit report became publicly available.   The summary of the report stated "we had concerns about the integrity and competence of certain management personnel, due to an attempt to provide us with falsified documentation, potential waste of state resources, and disregard of state and internal

policies, including management override of controls.  As a result, we are unable to obtain reliable management representations regarding financial activities and compliance to support our audit work.  This means we were unable to obtain sufficient appropriate audit evidence to provide a basis for an audit opinion.  We disclaimed an opinion on the financial schedules and notes for each of the two fiscal years ending June 30, 2020.  This disclaimer means we provide no assurance over the accuracy and completeness of the information presented in the financial schedules and note disclosures."

111.   On June 7, 2021, the audit division conducted a hearing regarding  the PSC in front of the Legislative Audit Committee.  Chairman James Brown stated that he had accepted the resignation of Centralized Services Division Administrator Mandi Hinman.  During questioning about the audit report, the auditor and the management from the Legislative Audit Division explained that this was a very unusual audit outcome and the worst audit the State of Montana had seen from any agency in decades.  Chairman Brown issued a press release regarding the audit report and employee issues that same day.  He stated to the committee during the hearing that he vouched for the work of the roughly 30 public servants at the agency.  He stated the reason he had become emotional was because news stories about the trouble at the PSC had affected the morale of staff, who had done an outstanding job on behalf of the state, some for 20 years.  He explained for them to sit through this and watch

this the last few years, can you imagine what that does.  He explained he felt sorry for the professional staff and what they had endured with Ms. Hinman at the helm. He went on to further state that Ms. Hinman was not competent in her position and lacked the skills necessary to hold the title. Chairman Brown's statements make clear that the Commissioners were aware of the poor conditions at the PSC, yet did nothing to stop them from occurring.

112.   Chairman Brown and Commissioner Fielder, having requested and reviewed Mr. Kraske's public redacted memos in December of 2020 should have recognized the unlawful, retaliatory, and discriminatory manner in which Mr. Kraske's employment was terminated and after being sworn in on January 4, 2021, attempted to mitigate the PSC's liability.  They failed to do so.

113.   Chairman Brown, as a licensed attorney, failed to follow his State of Montana bar obligations with regard to Mr. Kraske's termination and the substantial misconduct that he was made aware of at the PSC in early December of 2020.

114.   Mr. Kraske was terminated in violation of Montana and Federal law.  Mr. Kraske was a "whistleblower" concerning Mr. Zinecker, Ms. Hinman, Mr. Johnson, and the PSC's actions.  Mr. Kraske was terminated in retaliation for engaging in protected activity.  The PSC violated its own employment policies, as well as State and Federal law when it handled Mr. Zinecker, Ms. Hinman, and Mr. Kraske's employment substantially different.

## COUNT I: WRONGFUL TERMINATION
### Mont. Code Ann. § 39-2-901

115.   The Plaintiff realleges the previous allegations as if fully set forth herein.

116.   Plaintiff was hired as a staff attorney at the Montana PSC on January 22, 2008.

117.   Plaintiff successfully completed his probationary period of employment.

118.   Plaintiff applied for the position of Chief Legal Counsel in the Spring of 2013.

119.   Plaintiff completed the structured interview and scoring process and was hired to the position of Chief Legal Counsel in 2013.

120.   Plaintiff worked as Chief Legal Counsel from 2013 until he was terminated on December 31, 2020.

121.   Plaintiff completed his probationary period long before December 31, 2020.

122.   On December 30, 2020, Defendants Johnson, Lake, O'Donnell and Pinocci voted to terminate Kraske without cause, Defendant Koopman voted no.

123.   On January 4, 2021, Chairman Brown and Commissioner Fielder failed to limit the Commission's liability regarding the unlawful termination of Mr. Kraske.

124.   Plaintiff's termination was is in direct violation of the PSC's own policies as outlined in the PSC's internal operating manual, the Blue Book.

125.   Plaintiff's termination was discriminatory.

126.   Plaintiff's termination was done in retaliation for reporting substantial misconduct by Commissioners and certain PSC employees.

127.   Defendants' termination of Plaintiff's employment was wrongful and in violation of Mont. Code Ann. § 39-2-901, *et seq.* (Montana's Wrongful Discharge from Employment Act) because the termination was not for good cause and because the termination violated express provisions of PSC's policies and procedures.

128.   Plaintiff has been damaged as a result of Defendants' wrongful termination of his employment.

129.   The PSC is responsible for the acts and omissions of Defendants and its agents, in terminating Plaintiff's employment and violating Montana's Wrongful Discharge from Employment Act.

## COUNT II: RETALIATION
## Mont. Code Ann. § 2-2-145

130.   Plaintiff realleges all previous allegations as if fully set forth herein.

131.   Plaintiff's termination was done in retaliation for reporting substantial misconduct, including waste, fraud, and abuse by Commissioners and certain PSC employees to the PSC, the Department of Administration, and others.

132.   Defendants' termination of Plaintiff's employment was retaliatory and in violation of Mont. Code Ann. § 2-2-145.

133.   Plaintiff has been damaged as a result of Defendants' retaliatory termination of his employment.

134.   The PSC is responsible for the acts and omissions of Defendants and its agents, in terminating Plaintiff's employment and violating Mont. Code Ann. § 2-2-145.

135.   On January 4, 2021, Commissioner Brown and Commissioner Fielder failed to limit the Commission's liability regarding the retaliatory termination of Mr. Kraske.

### COUNT III: 42 USC § 1983
### Deprivation of Rights Protected by the First, Fifth and Fourteenth Amendments to the United States Constitution

136.   Plaintiff realleges all previous allegations as if fully set forth herein.

137.   Pursuant to the PSC's policies and procedures and Montana's Wrongful Discharge from Employment Act, Plaintiff had a property interest in continued employment with the PSC which was protected by the First, Fifth and Fourteenth Amendments to the United States Constitution which provides the Plaintiff the rights to due process.

138.   The Defendants violated Plaintiff's rights to continued employment because, among other things, PSC did not have "just cause" for terminating the Plaintiff's employment on December 31, 2020; because the Defendants did not inform Plaintiff of the cause for his employment being terminated; because the Defendants did not provide Plaintiff an opportunity to respond to his termination, including to raise objections; because the Defendants did not afford Plaintiff an opportunity "to be

heard" prior to his termination; because the Defendants denied Plaintiff the due process that the PSC's policies and procedures provided that he would receive; and because the Defendants were required to have its proposed action of terminating Plaintiff held in a public meeting which it and its Commissioners did not do.

139.   The Defendants did not have "good cause" to terminate Plaintiff's employment as required by Montana's Wrongful Discharge from Employment Act.

140.   The Defendants' actions in terminating Plaintiff's employment on December 31, 2020 were made under the color of state law and in violation of 42 USC § 1983.

141.   The Defendants' actions in terminating Plaintiff's employment were arbitrary, capricious and unreasonable and were committed with actual malice.

142.   The Defendants' violation of 42 USC § 1983 has caused the Plaintiff to lose wages and benefits.

143.   PSC is responsible for the acts and omissions of its Commissioners and its agents in depriving Plaintiff of his constitutional rights in violation of 42 USC § 1983.

**COUNT IV: PUNITIVE DAMAGES**

144.   Plaintiff realleges all previous allegations as if fully set forth herein.

145.   The Defendants acted with actual malice in that they had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Plaintiff. The Defendants deliberately proceeded to act in a conscious or intentional disregard

of the high probability of injury to the Plaintiff or deliberately proceeded to act with indifference to the high probability of injury to the Plaintiff.

146.   By virtue of the Defendants' conduct, the Plaintiff is entitled to an award of punitive damages from Defendants for the purpose of punishment and for sake of example.

WHEREFORE, the Plaintiff prays for the following relief:

A.   For compensatory damages allowed by law as proven at trial from the Defendants in their official and individual capacities;

B.   For punitive damages appropriate under the circumstances from the Defendants;

C.   For reasonable attorney's fees and costs pursuant to 42 USC § 1988;

D.   For the costs of suit and attorneys' fees associated with prosecuting this action; and

E.   For such further relief that this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 31st day of December, 2021.

WAGNER & LYONS, PLLC

By:  /s/ Nathan G. Wagner
        Nathan G. Wagner
        *Attorney for Plaintiff*